**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 14-1938

———————

SIMON PIRELA, a/k/a SALVADOR MORALES

v.

COMMISSIONER MARTIN HORN, Pennsylvania Department of Corrections;
DONALD T. VAUGHN, Superintendent of the
State of Correctional Institution at Graterford

Simon Pirela,
                    Appellant

———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Civil No. 2-90-cv-05013)
District Judge: Honorable Joel H. Slomsky

———————

Argued: September 14, 2016

Before: CHAGARES, GREENAWAY, JR., and RESTREPO, <u>Circuit Judges</u>.

(Opinion Filed: September 21, 2017)

Aline J. Fairweather (ARGUED)
Michael I. Frankel
Benjamin J. Eichel
Pepper Hamilton LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103

George G. Gordon
Dechert LLP
2929 Arch St
Philadelphia, PA 19104

     *Counsel for Appellant*

Joshua S. Goldwert (ARGUED)
Susan E. Affronti
Ronald Eisenberg
Molly S. Lorber
George D. Mosee, Jr.
R. Seth Williams
Philadelphia County Office of District Attorney
3 South Penn Square
Philadelphia, PA 19107

     *Counsel for Appellee*

———————

OPINION[*]

———————

CHAGARES, <u>Circuit Judge</u>.

Simon Pirela was convicted of murder after a bench trial. He appeals the District Court's denial of his petition for habeas corpus, which relied on the grounds of involuntary jury waiver and ineffective assistance of counsel. We will affirm.

I.

A.[1]

———————

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] These facts are largely taken from the Pennsylvania Supreme Court's decision in <u>Commonwealth v. Pirela</u>, 507 A.2d 23 (Pa. 1986), affirming Pirela's conviction and sentence.

In the early morning hours of May 5, 1981, Miguel Pirela, Carlos Tirado, and Pablo Ortiz shot heroin together. After returning home, Miguel Pirela died of a drug overdose. Miguel's brother, Simon Pirela, visited Ortiz's home later that day and announced to Ortiz's family that either Ortiz or Tirado "had to go" because they had killed his brother.

The next day, Simon Pirela and his other brother, Heriberto Pirela, went with another man, Gilberto Giraud Romero, to Romero's sister's house. The three men were joined by Tirado and another individual named Pedro Torres. Ortiz then arrived at the house. The Pirela brothers beat Ortiz with a tire rim, a hockey stick, and their fists. Heriberto Pirela instructed Tirado to inject Ortiz with "battery acid." Heriberto Pirela told Tirado that if he did not do so, he would also face death. Simon Pirela and Torres held Ortiz's hands while Tirado injected Ortiz. Ortiz then became unconscious. Simon Pirela told Tirado that if Ortiz does not die, then Tirado would also be killed.

Tirado then loaded Ortiz's body into Heriberto Pirela's car. He strangled Ortiz with a pair of socks. Simon Pirela also told Romero, who was driving the car, that he would kill him if he "ratted." Tirado and Romero then deposited Ortiz's body in a park, where it was eventually discovered by a jogger.

B.

Simon Pirela, Heriberto Pirela, and Carlos Tirado were tried in the Philadelphia Court of Common Pleas for the murder of Ortiz.

Pirela's instant petition is based on the trial court's representations made at a pretrial suppression hearing held on June 17, 1983, the Friday before trial was scheduled

3

to begin on Monday, June 20, 1983.  At the close of that hearing, Pirela's attorney

Romaine Phillips asked the judge to "rule . . . as to whether or not Mr. Pirela is being

charged as the actor of the murder or is Mr. Pirela being charged with the murder as

being a co-conspirator" because in the latter scenario, "Mr. Pirela could not be found

guilty of first-degree murder . . . ."  Appendix ("App.") 219.  The following discussion

then took place:

| | |
|---|---|
| MR. PHILLIPS: | . . . The important thing about it is this:  He's not subject to the death penalty if he is not deemed to be the doer, or the actor of the murder, or the aggravating circumstances. |
| THE COURT: | Why are you arguing all this?  Didn't you say it was going to be a waiver? |
| MR. PHILLIPS: | That's correct. |
| THE COURT: | He's not subject to the death penalty as long as he has me for a Judge. |
| MR. PHILLIPS: | Fine, your Honor. |

App. 219–20.  In a 1992 affidavit, Pirela asserted that Phillips told him that the trial judge

"had promised in court that if I waived my right to a jury in the Ortiz trial, she would not

sentence me to death."  App. 222.  Pirela also noted that the Spanish interpreter stated the

same.  Id.  In Phillips's 1992 affidavit, he characterized the judge's statement, "He's not

subject to the death penalty as long as he has me for a Judge" to mean that "if Mr. Pirela

waived his right to a jury trial in the Ortiz case, she would not sentence him to death."

App. 229.

On Monday, June 20, 1983, the trial judge conducted a jury waiver colloquy

before trial began.  During the colloquy, Pirela indicated that he was born in Puerto Rico

and went as far as the third grade in school.  He stated that he was satisfied with the court

interpreter's services as well as the representation of his attorney.  App. 233–34.

4

The judge then asked, "Mr. Pirela, you know you have a Constitutional right to be tried by a jury?" Pirela responded, "I do not understand that. What do you mean?" The judge then began to explain, "Do you realize you have a Constitutional right to have twelve people sit --" and Pirela interjected, "Oh yes, yes." App. 234-35. The judge proceeded to explain the selection and duties of the twelve jurors, a defendant's right to participate in jury selection, and the requirement of a unanimous verdict. The judge also explained that if Pirela waived the jury right, the judge would replace the jury as the arbiter of his guilt or innocence. Pirela indicated that he understood.

Next, the following exchange occurred between the trial judge and Pirela:

Q: Do you also realize whether you have a trial by jury or trial by Judge alone that the Rules of Evidence and the penalties if you are found guilty, would remain the same?
A: What do you mean by that?
Q: I mean the rules we go by remain the same.
A: I understand that question.
Q: Do you realize, Mr. Pirela, that I had your motion to suppress and I denied it; do you understand that?
A: Excuse me? What is it?
Q: You remember last week when you saw me the last time we litigated your motion to suppress a statement?
A: Yes.
Q: And I decided that motion in favor of the Commonwealth and against you.
A: Yes.
Q: You understand. You have an absolute right to have another Judge hear your case, if you wish; do you understand that?
A: Yes, I understand.
Q: I ask you do you want to have another Judge hear your case, or do you want me to hear your case?
A: I want you.
Q: All right. Now, let me ask you this: Have you understood everything that has been said so far?
A: Yes.

5

App. 236–38.  Next, the judge explained the concept of reasonable doubt.  She then asked

Pirela a series of questions regarding the voluntariness of the waiver.

> Q:  Has anyone promised you anything to get you to waive a trial by jury?
> A:  No.
> Q:  Has anyone made any threats to you or visited any violence against you?
> A:  No.
> Q:  Are you doing this of your free will?
> A:  Yes.
> Q:  Do you understand what you are doing?
> A:  Yes.
> Q:  Do you have any questions of any nature whatsoever that you at this time would like to ask your attorney, the District Attorney, or the Court?
> A:  No.
> . . . .
> Q:  Mr. Pirela, knowing everything that you know now, is it still your desire to give up your absolute right to a jury trial and to be tried by [the judge]?
> A:  Yes.

App. 238–39.  Pirela also signed a written waiver of his jury trial right.  App. 452.

At trial, Pirela testified in his own defense and admitted to taking part in the

beating of Ortiz but denied participating in or directing the killing.  The judge found all

three defendants guilty of murder in the first degree.  App. 401.

## C.

The sentencing phase of the trial began on June 27, 1983.  Prior to the sentencing,

the district attorney indicated that the Commonwealth "is perfectly willing to waive a

jury so long as we can be assured . . . that this Court, like a jury, has no conscientious,

philosophical objection which would prevent you from imposing the death penalty in a

proper case."

The judge replied,

6

I have no conscientious and philosophical objections, but mine doesn't matter. I will follow the law as I see it . . . . I will also tell you now that I will not impose a death penalty on all of them. That is not to say I won't impose the death penalty on some of them. So you take your choice.

App. 243. The district attorney agreed to waive a jury for the sentencing.

According to Pirela's affidavit, he was not present for this exchange and his attorney never informed him that the judge "had indicated in any way that she had changed her mind regarding her promise that she would not sentence me to death." App. 223.

Subsequently, the judge conducted jury waiver colloquies for the sentencing phase. At Pirela's waiver colloquy, the judge told him that after a bench trial, "the sentencing shall be conducted by a jury impaneled for that purpose unless waived by the defendant with the consent of the Commonwealth, in which case the Trial Judge shall hear the evidence and determine the penalty in the same manner as would a jury." App. 257. She also explained that if he chose a jury for his sentencing, all twelve members of a jury would have to be unanimous as to whether to impose the death penalty. If he waived a jury at sentencing, the judge alone may decide the sentence. Pirela stated that he understood. The judge also read to Pirela the law regarding aggravating and mitigating circumstances, including examples of each. App. 255–62. The judge also explained the process of jury selection.

Pirela confirmed to the judge that he was satisfied with his lawyer's services, that he had discussed the jury waiver at sentencing with his lawyer, that no one had forced him to waive his jury right, and that he had not been promised anything or coerced in his

7

decision. App. 262–64. Pirela confirmed that he understood clearly everything that was said and did not have any additional questions. Pirela's attorney then asked, "Knowing all of this, Mr. Pirela, would you like her Honor to make the decision as far as the sentencing," to which Pirela answered, "Yes." App. 264.

The prosecutor then had the following exchange with Pirela:

Q: Mr. Simon Pirela, the principal difference between a jury trial and a nonjury trial on this penalty phase is that in order to be given the death penalty by a jury, that jury must be unanimous; that is, all twelve must agree, whereas in a nonjury trial the Commonwealth need only convince [the sentencing judge] that the death penalty should be imposed.
A: I am not understanding. Is the death sentence already imposed?
MR. PHILLIPS: No.
(Mr. Phillips conferred with defendant Simon Pirela).
BY MR. BYRD: Do you understand that?
A: Yes.
Q: In other words, if the jury were eleven-to-one for death, you would be automatically given a life sentence. Do you understand that?
A: Yes.
Q: Are you making a decision to have [the judge] hear this case alone voluntarily and of your own free will?
A: Yes.

App. 264–65.

The judge then conducted the sentencing proceedings. Pirela's lawyer argued that mitigating factors — namely, that Pirela was suffering mental and emotional disturbance upon learning of his brother's death without knowledge of a cause of death, he was only twenty or twenty-one years old at the time, and he had a low level of education — supported a sentence of life imprisonment for Pirela. App. 267–69, 275–78. He also argued that Pirela was not the person who committed the murder itself. App. 268.

8

The judge sentenced Simon Pirela to death.[2] App. 280. She found an aggravating circumstance based on Pirela's prior conviction for a 1980 first-degree murder. She also found that Pirela's youth was a mitigating factor, but not great enough to outweigh the aggravating factor favoring a death sentence. She also noted that "[e]ven though you did not physically inflict the action which caused the death, you were the one who instituted those actions and they were carried out at your direction." App. 280.

D.

In the more than thirty years following his conviction, Pirela has filed numerous challenges in state and federal courts. We recount the most relevant below.

1.

First, Pirela appealed his conviction and sentence directly to the Pennsylvania Supreme Court pursuant to 42 Pa. Cons. Stat. § 722(4). He argued that the evidence at trial did not support a conviction of an offense more serious than voluntary manslaughter. The Pennsylvania Supreme Court rejected this argument, and concluded that there was sufficient evidence to support a conviction of premeditated first degree murder. Commonwealth v. Pirela, 507 A.2d 23, 25–28 (Pa. 1986) (hereinafter Pirela I).

Pirela also argued that his death sentence should be vacated because he relied on the trial court's assurance that he would not be subject to the death penalty. The Pennsylvania Supreme Court rejected that argument, determining that the judge's

_____

[2] In the same proceeding, the judge also sentenced Tirado and Heriberto Pirela to life imprisonment.

9

comment made no difference as Pirela had already decided to waive a jury. The court concluded that the comment was not a promise premised on jury waiver during trial, but rather an indication that "should the evidence prove as defense counsel predicted, appellant would not be sentenced to death by that tribunal." Id. at 28. Finally, the court noted that prior to the separate, sentencing-phase jury right waiver, the trial judge explicitly stated that she had no conscientious and philosophical objections to the death penalty and she would "follow the law as [she] see[s] it." Id. The court also rejected the ineffective assistance of counsel claim based on the judge's comment, reasoning that it was Pirela's decision to waive the jury trial right and not his attorney's. Id. at 31. The court rejected Pirela's other appeal points as well, and affirmed the conviction and death sentence.

2.

After his direct appeal, Pirela filed two state habeas petitions. On June 8, 1992, Pirela, represented by new counsel,[3] filed a petition under Pennsylvania's Post Conviction Relief Act, 42 Pa. Cons. Stat. § 9541, et seq. (hereinafter "PCRA"). App. 979. In this first PCRA petition, Pirela advanced six bases for reversal of his conviction and sentence, two of which are relevant to the instant appeal: first, that his jury waivers at both the guilt and the sentencing stages were unknowing and involuntary, and second, that he received ineffective assistance of counsel.

---

[3] We express our gratitude to Pirela's attorneys, who have handled this matter pro bono for many years. We commend them for the high quality of their representation. Lawyers who act pro bono fulfill the highest service that members of the bar can offer to indigent parties and to the legal profession.

In support of the first PCRA Petition, Pirela and his trial attorney Phillips both provided affidavits. Pirela's affidavit stated, "I decided to waive my right in the Ortiz trial because I believed that if I did so, [the trial judge] would not sentence me to death." App. 222. Phillips stated in his affidavit that at the time the trial judge made her comment regarding the death penalty, Pirela had "not yet reached a final decision that he would waive his right to a jury" in either the guilt or the sentencing phases of trial. App. 229.

The PCRA court held an evidentiary hearing, including testimony from Pirela's ailing mother. App. 308–24. In November 1994, the case was reassigned to the original trial judge, who denied a motion for an additional evidentiary hearing.

On December 7, 1994, that judge denied the first PCRA petition. App. 438. Pirela appealed to the Pennsylvania Supreme Court, which affirmed the denial of relief under the PCRA. Commonwealth v. Pirela, 726 A.2d 1026 (Pa. 1999) (hereinafter "Pirela II"). The Pennsylvania Supreme Court concluded that Pirela's arguments relating to his jury waiver were previously litigated in the direct appeal and therefore was ineligible for PCRA review under 42 Pa. Cons. Stat. § 9543. Id. at 1031-32. The court noted that although Pirela also claimed ineffective assistance of appellate counsel on direct appeal, Pennsylvania law provides that new theories on post-conviction review of claims previously litigated on direct appeal cannot be predicated on allegedly ineffective assistance of prior counsel. Id. at 1032.

Pirela filed his second PCRA petition on August 19, 2002. This petition challenged Pirela's two death sentences (Pirela had been convicted and sentenced to

11

death for a separate murder before the Ortiz trial). In his petition, Pirela argued that both death sentences were unconstitutional under the United States Supreme Court's opinion in Atkins v. Virginia, 536 U.S. 304 (2002), which held that the execution of individuals who are "mentally retarded"[4] constituted cruel and unusual punishment prohibited under the Eighth Amendment. After an evidentiary hearing, at which testimony from experts regarding Pirela's mental capacity was presented, the court reviewing the second PCRA petition found that Pirela "qualifies as a mentally retarded person where execution is prohibited by law." App. 4611. The court thus granted the petition, vacated the death sentences, and imposed two sentences of life imprisonment. App. 4619. The Pennsylvania Supreme Court subsequently affirmed. Commonwealth v. Pirela, 929 A.2d 629 (Pa. 2007) (per curiam). Pirela had also been convicted of and sentenced to two life sentences for two additional murders. Therefore, Pirela is now serving four concurrent life sentences for the four murders for which he was convicted.

3.

Pirela also filed federal habeas petitions in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 2254. The first such petition was filed on October 29, 1986. The court dismissed the petition without prejudice for

---

[4] The language of the second PCRA petition and of Atkins refers to "mental retardation," although that phrase is now disfavored. See Rosa's Law, Pub. L. No. 111-256, 124 Stat. 2643 (2010) (amending numerous federal laws to replace "mental retardation" with "intellectual disabilities").

12

failure to exhaust state remedies. Pirela filed the petition in this case pro se on July 31, 1990. That petition was held in suspense pending the state court proceedings.[5]

After the Pennsylvania Supreme Court affirmed the vacating of his death sentences in 2007, Pirela filed a Third Amended Petition under § 2254 on June 11, 2009 (hereinafter "Petition"), which is the operative pleading in the instant action. In this Petition, he withdrew all of his claims challenging his death sentence and instead only challenged his conviction. In his Petition, Pirela advanced nine bases for vacating his conviction, all of which were denied by the District Court. App. 119, 42. Pirela timely appealed.

This Court granted a certificate of appealability based on two grounds for relief: 1) that Pirela was denied the right to a jury during the guilt phase of his trial, and 2) that Pirela had ineffective assistance of counsel when his attorney advised him regarding his jury waiver during the guilt phase of the trial.

II.

We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253. Our review of the District Court's denial of habeas corpus is plenary, but we "review findings of fact for clear error." Gardner v. Grandolsky, 585 F.3d 786, 788 (3d Cir. 2009); see also Szuchon v. Lehman, 273 F.3d 299, 312 (3d Cir. 2001) ("Our review is plenary on the merits of the claims over which we have jurisdiction, as the District Court relied exclusively on the state court record in deciding the petition and did not hold an evidentiary hearing.").

---

[5] The District Court also appointed counsel for Pirela. See App. 980-81.

Because Pirela's federal habeas petition was filed prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), we use pre-AEDPA law to evaluate his claims. "Before AEDPA, state court factual findings were presumed correct unless, inter alia, they were not 'fairly supported by the record.'" Szuchon, 273 F.3d at 312 (quoting the former 28 U.S.C. § 2254(d)(8) (1966)). Other factors may undo the presumption of correctness, including if the state court failed to resolve the merits of the factual dispute, employ adequate factfinding procedures, or develop material facts. 28 U.S.C. § 2254(d) (1966); see also Sumner v. Mata, 449 U.S. 539, 546–47 (1981). "State court legal conclusions [are] reviewed de novo, as [are] mixed questions of law and fact." Szuchon, 273 F.3d at 312.

III.

A.

Pirela makes two claims that he involuntarily and unknowingly waived his jury trial right for the guilt phase of the trial: first, that he relied on a false promise that the trial judge made to him that if he waived his jury trial right, she would not sentence him to death, and second, that he was not capable of making a voluntary and knowing waiver of his jury trial right because of his intellectual disabilities. We note that our review of these claims under § 2254 requires deference to the state court findings.[6] "This deference

---

[6] Pirela also makes passing requests that we remand to the District Court for an evidentiary hearing, although he did not engage in any analysis of this issue. In general, federal courts must hold an evidentiary hearing "if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding . . . ." Jefferson v. Upton, 560 U.S. 284, 290 (2010) (quoting

14

requires that a federal habeas court more than simply disagree with the state court before

rejecting its factual determinations. Instead, it must conclude that the state court's

findings lacked even 'fair support' in the record" in order for relief to be merited.

Marshall v. Lonberger, 459 U.S. 422, 432 (1983) (quoting 28 U.S.C. § 2254 (alterations

omitted)).

---

Townsend v. Sain, 372 U.S. 293, 312 (1963)). There are six circumstances in which an
evidentiary hearing is required under the pre-AEDPA standard:

> (1) the merits of the factual dispute were not resolved in the state hearing;
> (2) the state factual determination is not fairly supported by the record as a
> whole; (3) the fact-finding procedure employed by the state court was not
> adequate to afford a full and fair hearing; (4) there is a substantial allegation
> of newly discovered evidence; (5) the material facts were not adequately
> developed at the state-court hearing; or (6) for any reason it appears that the
> state trier of fact did not afford the habeas applicant a full and fair fact
> hearing.

Id. (emphasis omitted).

Pirela did not support his request for an evidentiary hearing with any of the above
factors. Nevertheless, our dissenting colleague identified factors two, three, and five as
supportive of an evidentiary hearing. We disagree and conclude that none of these
factors apply. As to factor two, our analysis below will demonstrate that the record
provides fair support for the state court factual determinations. Again, as to factors three
and five, Pirela never raised them as bases for an evidentiary hearing. Moreover, as to
the third factor, because the argument for involuntary waiver based on intellectual
disability is procedurally defaulted, there is no basis for opening evidentiary hearings on
that subject. See Boyd v. Waymart, 579 F.3d 330, 359 (3d Cir. 2009) (noting that the
district court has broad discretion to hold evidentiary hearings except when facts were not
developed at the state court levels because of procedural default). As to the fifth factor,
the Pennsylvania Supreme Court's decision in the direct appeal made clear conclusions of
dispositive facts. See Pirela I, 507 A.2d at 28 (concluding that Pirela's decision to waive
a jury "was made prior to the court's comment," that the trial court's comment "appears
not to constitute a guarantee that appellant would not be sentenced to death under any
circumstances," and that the trial court's comment "could not have lulled appellant into
waiving his right to a jury." (quotation marks omitted)). Because the Townsend factors
are not met, an evidentiary hearing is not warranted in this case.

15

1.

We first examine the trial judge's statement, "he's not subject to the death penalty as long as he has me for a judge," which Pirela characterizes as a promise. According to Pirela, both the interpreter and his attorney told him that the judge was telling him "if I waived my right to a jury in the Ortiz trial, she would not sentence me to death." App. 222, 229. The District Court correctly evaluated the state court's findings of fact that Pirela did not rely on any such promise from the judge when he elected to waive the jury right during the guilt phase of his trial.

As the District Court noted, the Pennsylvania Supreme Court on direct appeal made several factual findings that are fairly supported by the record. See Szuchon, 273 F.3d at 312; see also Pemberthy v. Beyer, 19 F.3d 857, 864 (3d Cir. 1994) (holding that presumptions of correctness of state court determinations apply "not only when a state trial court makes what are conventionally regarded as findings of fact, but also when a state appellate court makes factual determinations in a written opinion"). The Pennsylvania Supreme Court found that Pirela had already decided to waive a jury before the judge's comment, and therefore the comment did not induce him to waive his jury right. Pirela I, 507 A.2d at 53. See also Pirela II, 726 A.2d at 1031, n.9. This conclusion is supported by the fact that the colloquy between the trial judge and the defense counsel indicates a jury waiver had already been discussed and both the judge and the parties fully understood that Pirela would waive the jury right. App. 219–20 ("THE COURT: Why are you arguing all this? Didn't you say it was going to be a waiver? MR. PHILLIPS: Correct."). That a jury waiver was the plan at this point is further supported

16

by the fact that this three-defendant capital murder trial was slated to begin the next business day without a jury being ordered. Therefore, while the formal waiver colloquy for waiving the jury at the guilt phase took place on the following Monday before trial began, the record indicates that Pirela had already made up his mind by the Friday of the hearing, when the judge made her comment.[7]

Pirela argues that because his attorney was still trying to "pin down" the specific charges against him at trial, the decision regarding jury waiver was still "in flux." Reply Br. 10-11. This is unpersuasive, as there is no record evidence to support a relationship between the defense attorney's efforts to clarify the Commonwealth's approach to evidence and Pirela's decision to waive a jury. Moreover, while Pirela may not have yet made a formal waiver on paper, there is no record evidence that there was anything to sway Pirela against waiver at this point, even absent the judge's comment. While Pirela's counsel stated in his affidavit that "Mr. Pirela and I had not yet reached a final decision that he would waive his right to a jury for the guilt/innocence" phase, App. 229, this does not refute the state court's conclusion that Pirela had elected to waive a jury all along. We recognize that the fact that the signed waiver and colloquy proceedings took place

---

[7] Two additional record facts not previously discussed by the state court also support the factual finding that Pirela's waiver of a jury trial was a decision made ahead of time and not induced by the judge's statement. First, Pirela had been tried by a jury two times before in other murder trials. See App. 388-89. Few criminal defendants have had as much experience with juries as Pirela did at the time of the Ortiz trial. Second, the fact that Pirela had been convicted by juries in the two prior trials is at least somewhat probative of the motivations behind waiving a jury during the guilt phase in this third trial.

after the weekend did provide Pirela with a one-last opportunity to change his mind; but in this case, Pirela has proffered no evidence that he planned to elect a jury trial for the guilt phase at any point, or that the trial judge's statement made him change his mind.[8]

Second, the Pennsylvania Supreme Court's conclusion that the trial judge's comment "appears not to constitute a 'guarantee'" of a no-death sentence if Pirela chooses to waive a jury during the guilt phase, but rather a belief that "should the evidence prove as defense counsel predicted, appellant would not be sentenced to death by that tribunal" is also fairly supported by the record evidence. Pirela I, 507 A.2d at 28. Put in context, the statement was made after the trial court noted that the sentencing exposure was dependent on what "[t]he witnesses may get up from there and say," which may be "something different than what [the prosecutor] thinks they are going to say." App. 219. Additional important context is that the defendant would have two opportunities to choose a jury or judge as the arbiter: once at the guilt phase and once again at the sentencing phase. The record in context supports the interpretation of the trial judge's comment as an indication that she would not impose the death penalty if the evidence came out as the defendant indicated and if he were to choose to be sentenced by

---

[8] Moreover, there is no constitutional requirement to conduct a waiver colloquy. United States v. Lilly, 536 F.3d 190, 194 (3d Cir. 2008) ("[W]hile an on-the-record colloquy is preferred, it is not constitutionally required."); United States v. Anderson, 704 F.2d 117, 119 (3d Cir. 1983). See also Fed. R. Crim. P. 23 (requiring only a written waiver of jury trial, not oral colloquy). Although Pirela is correct that under Pennsylvania Criminal Procedure Rule 620, the waiver colloquy is procedurally required, and while such a colloquy is likely wise, failure to do so does not yield a constitutional violation. See Commonwealth v. Mallory, 941 A.2d 686, 696-97 (Pa. 2008).

18

her.  The evidence does not support Pirela's interpretation that the comment was a promise underlined(predicated) on Pirela's waiver of the jury right in the guilt phase of the trial (assuming, of course, that he also waived the jury at sentencing).  Because there is no record evidence supporting Pirela's interpretation that the judge would not impose the death penalty if Pirela waived a jury at the guilt phase, we conclude that there is adequate support in the record for the state court's finding that the parties were likely to have adopted the first interpretation.  As such, we agree that Pirela did not base his waiver of the guilt phase jury on the judge's statement, since the statement only applied to sentencing.

Third, Pirela's on-the-record waiver colloquies before both the guilt and sentencing phases of his trial provide support for the state court's factual finding that he did not rely on the judge's statement in waiving his jury right at the guilt phase.  Indeed, before trial began, when asked whether anyone promised anything to encourage him to waive the jury, Pirela unequivocally answered "no."  App. 238.  He also confirmed that he was acting of his own volition and understood what he was doing.  He was offered and declined to ask any questions of his attorney, the prosecutor, or the judge.  He then confirmed his waiver.  App. 238–39.  Pirela again indicated that he understood the jury waiver for sentencing and wanted to be sentenced by the trial judge.  Pirela now claims his answers to the colloquy questions were not sufficiently reliable because he was merely answering the questions in a rote manner.  He urges that the instances when he

19

expressed confusion should support a determination that his waiver was involuntary.[9]  To the contrary, the record suggests otherwise, and indicates that his answers to the questions posed by the trial judge were anything but rote.   For example, Pirela asked several questions regarding issues he did not understand, such as the judge's comment regarding rules of evidence and her reference to his earlier suppression hearing.  App. 237–38.  After the judge further explained her question, Pirela stated that he understood the question and answered it.  Id.  He also separately confirmed that he understood everything discussed so far.  Id.

Because there is fair support in the record evidence for the Pennsylvania Supreme Court's determination that the judge's comment did not induce Pirela to waive his jury right at the guilt phase of his trial, Pirela's first claim fails.

2.

Pirela's second claim is that his jury waiver during the guilt phase was not knowing and voluntary because he is intellectually disabled and could not have

---

[9] Pirela's Petition also claims that his language barrier, illiteracy, and mental disability contributed to his confusion.  While we recognize that a defendant suffering from those issues might well be at a disadvantage, we note that our role in federal habeas review is not to imagine what contextual experience the defendant might have had at the time, see Dissent at 10, but rather to examine whether the record facts fairly support the state courts' conclusion.  Moreover, as we discuss infra, the claim as to mental disability is procedurally defaulted.  Finally, we note that nowhere in Pirela's petition does he claim that the interpreter services were inadequate or that his illiteracy impeded his actual understanding of the proceedings.

understood the decision.[10] We hold that the District Court correctly determined that this claim was procedurally defaulted.

Pirela acknowledges that on direct appeal, he did not make any claim regarding the voluntariness of his jury waiver based on intellectual disability. He contends that he did, however, make the claim in his first PCRA petition. We conclude that Pirela's first PCRA petition was insufficient to overcome the standards of procedural default.[11]

Pirela has not demonstrated that his claim has been "fairly presented" to a state court. Both before and after the enactment of AEDPA, federal courts have required that "a prisoner afford the state courts a chance to correct an alleged constitutional violation before invoking federal jurisdiction . . . ." Szuchon, 273 F.3d at 322; see also Rose v. Lundy, 455 U.S. 509, 520 (1982). For a federal habeas claim to have been "fairly presented" to a state court, "it must be the substantial equivalent" of the claim that the state courts reviewed either on direct appeal or collateral review. Lambert v. Blackwell,

---

[10] We note that even in this Petition, Pirela did not advance a stand-alone involuntary waiver claim on this basis. Rather, he stated that "Relief from this Court is particularly critical because this case involves waiver of a jury in reliance on assurances given to a Spanish-speaking, illiterate and severely mentally impaired capital defendant . . . ." App. 161-162 (Third Am. Petition ¶ 87). However, the District Court appeared to treat the mental incapacity argument as a claim for relief, and Pirela's counsel stated during oral argument that this argument can be a stand-alone basis for relief. Regardless of whether the claim is a part of the false promise claim or an independent one, our conclusion as to procedural default is the same.

[11] Although Pirela's second PCRA petition was based on his intellectual disability, that petition only challenged his sentence, not his conviction. Therefore, he cannot rely on issues raised in that petition to avoid procedural default here.

21

134 F.3d 506, 513 (3d Cir. 1997), as amended (Jan. 16, 1998). "[M]ere similarity" between the claims is not sufficient. Duncan v. Henry, 513 U.S. 364, 366 (1995).

Pirela's involuntary waiver claim in the first PCRA petition is predicated on the "false promise" theory. Only two sentences contained in one paragraph in the ten-page sub-section on involuntary jury waiver in the initial petition discuss Pirela's intellect. App. 1003–04. That paragraph begins by stating that Pirela did not speak English, has a third-grade education, and cannot read or write; none of these facts alone suggest intellectual disability. App. 1003. It then lists affidavits from Pirela's family expressing their belief that "he has had problems understanding and communicating throughout his entire life," problems his family believes relate to his mother's pregnancy and childbirth process. It also notes that a court-ordered psychological report states that Pirela had "subnormal intellect." App. 1003–04. On appeal from the denial of the first PCRA petition, Pirela's brief contains even scanter mention of intellectual disability as a basis for involuntary waiver. App. 1060–72.

In Keller v. Larkins, 251 F.3d 408, 413 (3d Cir. 2001), we concluded that the petitioner's federal habeas claim was procedurally defaulted because he relied "entirely on passing references to the concept of a 'fair trial' in his state court papers," and because the state court papers only "contained one sentence referring to this concept . . . ." Id. at 414. Here, by making a passing reference to his intellectual problems in the context of an involuntary waiver argument premised on the judge's alleged promise, Pirela has not satisfied the "fairly presented" requirement for avoiding procedural default. We have required that "[b]oth the legal theory and the facts supporting a federal claim must have

22

been submitted to the state courts." Lesko v. Owens, 881 F.2d 44, 50 (3d Cir. 1989).

While Pirela had presented some facts that could theoretically support a finding of intellectual disability, he did not present an independent legal theory based on those facts. In short, he did not argue that his waiver of the guilt-phase jury was the result of his intellectual disabilities.[12]

Moreover, although Pirela's first PCRA petition used evidence of intellectual disability to support an ineffective assistance of counsel claim, our precedents state that it is not sufficient. We have noted that "mere similarity of claims is insufficient to exhaust" state remedies and the claim in state court must have "factual and legal substance" that puts the other party "on notice that a federal claim is being asserted." Keller, 251 F.3d at 413 (internal citations and quotation marks omitted). "It is not sufficient that all the facts necessary to support the federal claim" of involuntary waiver based on intellectual disability "were before the state courts" in the context of an ineffective assistance of counsel claim. Id. (citing Anderson v. Harless, 459 U.S. 4, 6 (1982)).

---

[12] In reviewing the first PCRA petition, the Pennsylvania Supreme Court noted that the jury waiver argument was previously litigated on direct appeal, and that in the alternative, "it has been waived." Pirela II, 726 A.2d at 1032. Thus, even if Pirela did raise a proper "new" argument regarding intellectual disability as a basis for involuntary waiver in his first PCRA petition, the Pennsylvania Supreme Court's statement that any such argument was waived bars us from reaching the merits today. As long as the Pennsylvania Supreme Court's ruling as to waiver is adequate and based on state law grounds that are independent of the federal question, our court will not review it. Szuchon, 273 F.3d at 325; see also Reynolds v. Ellingsworth, 843 F.2d 712, 717 (3d Cir. 1988). Because the Pennsylvania Supreme Court determined based on adequate and independent state procedural rules that Pirela had waived the issue by failing to present it in his direct appeal, see Pa. R.A.P. 302; Commonwealth v. Bond, 819 A.2d 33, 39 (Pa. 2002), the issue is procedurally defaulted at the federal habeas stage.

Pirela finally argues that any default is excused because the PCRA court had, in 1993, denied discovery and expert funding requests for exploration of his mental competence. App. 447–51. This argument is unpersuasive. While additional expert analysis would likely have bolstered a properly presented argument for involuntary waiver based on mental disability, the lack of such additional analysis did not prejudice Pirela as to his default on the issue. See McCandless v. Vaughn, 172 F.3d 255, 260 (3d Cir. 1999) ("[F]ederal courts may not consider the merits of [procedurally defaulted] claims unless the applicant establishes 'cause and prejudice' or a 'fundamental miscarriage of justice' to excuse his or her default." (quoting Coleman v. Thompson, 501 U.S. 722, 750 (1991)). In the very same PCRA petition, filed in 1992 before the motion for discovery and expert funding, Pirela cited to existing evidence regarding his intellectual disabilities in connection with his ineffective assistance claim, but failed to do so with respect to his involuntary waiver claim. Thus, the failure to link up evidence of his intellectual disabilities with his claim of involuntary waiver was not caused by lack of discovery and expert analysis.[13] Therefore, we will affirm the District Court's determination that the involuntary waiver claim based on intellectual disability was procedurally defaulted.

---

[13] Nor can Pirela argue for an exception to the procedural default based on "miscarriage of justice." Hubbard v. Pinchak, 378 F.3d 333, 338 (3d Cir. 2004). To present such a claim based on miscarriage of justice, a defendant must demonstrate that any "constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 321 (1995) (quoting Murray v. Carrier, 477 U.S. 478, 496 (1986)). He has not done so.

B.

Pirela advances a separate claim in the alternative in his petition: if we were to affirm the District Court's determination that the trial judge's statement regarding the death penalty was <u>not</u> a promise predicated on Pirela's waiver of the guilt-phase jury, then Pirela's trial counsel necessarily was ineffective in advising Pirela that the judge made such a promise.

We review ineffective assistance of counsel claims based on the test set forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 688 (1984), which has two requirements: "counsel's representation fell below an objective standard of reasonableness," <u>id.</u> at 688, and that but for the deficient representation, it was reasonably probable that "the result of the proceeding would have been different," <u>id.</u> at 694. Here, Pirela argues that he suffered prejudice because he would have prepared for a different case — for example, second degree murder instead of first — had he known that the death penalty was a possibility. However, a <u>Strickland</u> claim requires "reasonable probability," defined as "probability sufficient to undermine confidence in the outcome. That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." <u>Gov't of Virgin Islands v. Vanterpool</u>, 767 F.3d 157, 165 (3d Cir. 2014).

There is no evidence supporting a reasonable probability that Pirela would not have been convicted of first degree murder had his counsel pursued an undefined, different strategy at trial. While Pirela suggests that his counsel may not have called him to testify, there is no record evidence that Pirela's testimony was what led to the first-degree murder conviction. To succeed on a <u>Strickland</u> claim, a defendant must do more

25

than speculate as to a more favorable outcome. Moreover, even if Pirela had been convicted of second degree murder instead, there would be no prejudice because under Pennsylvania law, second degree murder carries a mandatory life imprisonment sentence, which Pirela is now serving. 18 Pa. Cons. Stat. § 1102(b). See also Rainey v. Varner, 603 F.3d 189, 202 (3d Cir. 2010) (rejecting an ineffective assistance of counsel claim because even if the defendant was "retried and convicted of second degree murder, he would have received the same sentence"). Because Pirela has not demonstrated prejudice, we need not review the first prong of the Strickland test regarding whether his counsel's representation fell below an objective level of reasonableness.

Pirela also asserts that even if he has not suffered prejudice, he is nonetheless entitled to relief because of an exception for cases where there is "structural error," which are not subject to harmless error analysis. In doing so, Pirela cites to an Eighth Circuit decision, McGurk v. Stenberg, 163 F.3d 470 (8th Cir. 1998), in which trial counsel (and the court) failed to inform the defendant that he had the right to a trial by jury and the defendant was convicted in a bench trial. There, the court held that "the denial of a jury trial is a structural error subject to automatic reversal." Id. at 474. The analysis in McGurk follows that of Arizona v. Fulminante, 499 U.S. 279, 310 (1991), in which the Supreme Court held that while trial errors are subject to harmless error analysis, some constitutional deprivations are "structural defect[s] affecting the framework within which the trial proceeds, rather than simply [] error[s] in the trial process itself." The Fulminante Court noted examples of the right to self-representation at trial, the right to a public trial, and the right against unlawful racial exclusion of grand jury members. It

26

added, "Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." Id. (quoting Rose v. Clark, 478 U.S. 570, 578 (1986)); see also Neder v. United States, 527 U.S. 1, 8 (1999) ("If the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other constitutional errors that may have occurred are subject to harmless-error analysis." (internal alterations and citations omitted)).

Pirela argues that the circumstances of his conviction are similarly based on structural error. We disagree, and conclude that the District Court did not err in determining that Pirela's decision to waive his jury trial right during the guilt phase was not dependent on his counsel's advice based on the judge's statement. While a situation like that of the defendant in McGurk suggests that a fundamental right affecting the integrity of the trial proceedings had been abrogated, there is no record evidence suggesting that Pirela's trial counsel's characterization of the trial judge's remarks did the same for Pirela in this case. As discussed above, there is no record evidence that Pirela's decision to waive a jury at the guilt phase of his trial was impacted by the trial judge's statement, or his attorney's construction of it. Prior to the judge's statement, Pirela had already decided that a non-jury trial was his preference, as indicated by the hearing transcript where the judge confirmed this preference in Pirela's presence and the fact that trial was slated to begin as a bench trial one business day later.

Furthermore, the judge apprised Pirela of the right to a jury in great depth during the waiver colloquy before trial began (and after her statement). While Pirela initially

27

asked the judge to explain the right to a jury trial, once the judge began to explain the concept of a twelve-person jury, Pirela interjected, "Oh yes, yes." App. 234-35. The judge nevertheless continued with the full explanation of the jury right and the voir dire process, as well as the procedure should Pirela waive the jury and proceeded to a bench trial. Pirela then unequivocally stated that he understood these issues, orally stated his desire to waive a jury trial, and signed a written jury waiver.[14] App. 238–39, 452.

This situation is very different from one in which a defendant had never been apprised of the concept of the right to a jury trial and had no basis for understanding it. Here, Pirela indicated that he understood that such a right existed and that he could choose to forgo it. Even if Pirela could prove that he relied on his counsel's advice, there is also nothing in the record suggesting that Pirela would have changed his mind and opted for a jury trial if his attorney did not advise him of the so-called "promise" by the judge to not impose the death penalty. See Vickers v. Superintendent Graterford SCI, 858 F.3d 841, 857 (3d Cir. 2017) ("[W]here a defendant claims ineffective assistance based on a pre-trial process that caused him to forfeit a constitutional right, the proper prejudice inquiry is whether the defendant can demonstrate a reasonable probability that, but for counsel's ineffectiveness, he would have opted to exercise that right.").

---

[14] Moreover, Pirela had also already participated in two previous jury trials (also for murder charges), which suggests that he had an understanding of his jury trial entitlement before he decided to waive it.

28

Pirela's reliance on <u>McGurk</u>, therefore, is misplaced.  Any purported mistake by his trial counsel did not create structural error because Pirela understood his rights to a jury trial and chose to waive it.  This case does not fit under the "narrow holding." <u>McGurk</u>, 163 F.3d at 475, n.5.[15]  Because Pirela has not satisfied the <u>Strickland</u> test and because he has failed to demonstrate structural error,[16] we agree with the District Court and conclude that Pirela's ineffective assistance of counsel claim was properly denied.

IV.

For the reasons stated above, we will affirm the judgment of the District Court.

---

[15] Pirela also appears to suggest a second line of structural-error analysis, that the judge was not acting "reliably and impartially."  Pirela Br. 45.  There is nothing in the record to suggest such a claim.  Indeed, his ineffective assistance of counsel claim is based on his attorney's <u>misinterpretation</u> of the judge's remarks as a promise regarding the guilt phase of his trial.

[16] Moreover, even if we were to accept Pirela's argument that his counsel's ineffective assistance led to structural error, he nevertheless would not have met his burden of proof. In its recent decision <u>Weaver v. Massachusetts</u>, 137 S. Ct. 1899 (2017), the Supreme Court held that "[a]n error can count as structural even if the error does not lead to fundamental unfairness in every case," <u>id.</u> at 1908, and, in the context of an ineffective assistance claim in a habeas petition, may not lead to relief for the petitioner absent a showing of prejudice, <u>id.</u> at 1910.  Under <u>Weaver</u>, even if Pirela's counsel's conduct led to structural error, that term "carries with it no talismanic significance" because Pirela cannot show either a reasonable probability of a different outcome in his case, or that the error was "so serious as to render his . . . trial fundamentally unfair."  <u>Id.</u> at 1911.

RESTREPO, *Circuit Judge*, dissenting in part and concurring in the judgment in part.

In Simon Pirela's 1983 capital murder case, a Philadelphia trial judge promised Pirela that if he waived his right to a jury trial, she would not impose the death penalty. Pirela agreed. The trial judge convicted Pirela, broke her promise and sentenced him to death.

Pirela was later resentenced to life imprisonment under *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that it is cruel and unusual punishment to sentence an intellectually disabled person to death. Pirela now challenges his conviction in habeas corpus proceedings under 28 U.S.C. § 2254. Pirela alleges that the trial judge induced him to waive his right to a jury trial, in violation of the Sixth and Fourteenth Amendments of the United States Constitution. Because I believe that Pirela is entitled to an evidentiary hearing on this claim, I respectfully dissent.[1]

# I

Pirela's jury trial waiver claim arises from a pretrial hearing in his capital murder case in the Philadelphia Court of Common Pleas. At this hearing, Pirela's defense counsel tried to elicit a concession, either from the trial judge or from the Commonwealth, that Pirela was not subject to the death penalty because he would be tried as a conspirator only. The following exchange then took place between the trial judge and defense counsel:

> The Court: How can I rule on that? I haven't heard any evidence and I don't see how Mr. Byrd [the assistant district

---

[1] I concur in the judgment of the majority denying Pirela's ineffective assistance of counsel claim.

attorney] can make a representation. The witnesses may get up from there and say something different than what he thinks they are going to say. . . .

Defense Counsel: . . . The important thing about it is this: He's not subject to the death penalty if he is not deemed to be the doer, or the actor of the murder, or the aggravating circumstances.

*The Court: Why are you arguing all this? Didn't you say it was going to be a waiver [a non-jury trial]?*

Defense Counsel: That's correct.

*The Court: He's not subject to the death penalty as long as he has me for a Judge.*

App. 219-20 (emphasis added).

Pirela waived his right to a jury trial three days later.[2] Pirela completed an oral, guilt-phase waiver colloquy, which included no mention of the trial judge's promise that she would not sentence him to death. Nor did the guilt-phase waiver colloquy advise Pirela that he could still be sentenced to death after a non-jury trial. The trial judge did ask Pirela generally, "Has anyone promised you anything to get you to waive a trial by jury," to which Pirela answered "No." App. 238.

Pirela proceeded to a non-jury trial before the trial judge, who convicted Pirela. She sentenced him to death. As the majority describes in greater detail, Pirela subsequently filed a direct appeal and a first petition for collateral relief under what is now entitled the Post-Conviction Relief Act (PCRA). In his first PCRA petition, Pirela

_____

[2] The trial judge made her promise on a Friday, and Pirela waived his right to a jury trial on the following Monday.

alleged that his guilt-phase jury trial waiver was induced by the trial judge's promise not to sentence him to death.

In support of his first PCRA, Pirela submitted affidavits. The affidavits of Pirela and defense counsel both stated that the trial judge's promise induced Pirela to waive his right to a jury trial. Pirela also argued, in the same jury trial waiver claim, that he was particularly susceptible to the trial judge's misrepresentation because of his mental impairments, which prevented him from understanding "the nature of the fundamental right he was waiving." App. 1002. Pirela provided records establishing that he has a third grade education, is a non-English speaker, is illiterate in his own language, Spanish, has had lifelong problems with understanding, communication and memory, and, according to a doctor, has a "subnormal intellect." App. 346.

Pirela requested an evidentiary hearing in his first PCRA, which the trial court denied.[3] The trial court denied relief, and the Pennsylvania Supreme Court affirmed. *Commonwealth v. Pirela (Pirela II)*, 726 A.2d 1026, 1031-32 (Pa. 1999).

Pirela later filed a second PCRA petition challenging his death sentence under *Atkins v. Virginia*. In 2004, the trial court vacated Pirela's death sentence after finding that Pirela is intellectually disabled. The Pennsylvania Supreme Court affirmed. *Commonwealth v. Pirela*, 929 A.2d 629 (Pa. 2007) (per curiam).[4]

---

[3] The trial court held an evidentiary hearing only "to preserve the testimony of [Pirela]'s aged mother." App. 442. The trial court denied an evidentiary hearing in all other respects.

[4] In a hearing on Pirela's second PCRA, a radiologist and expert in brain pathology provided testimony that Pirela has "significant organic brain damage . . . consistent with a diagnosis of mental retardation." App. 4612. A neuropsychologist who

Presently before this court is Pirela's habeas corpus petition.[5] Pirela again asserts that the trial judge induced him to waive a jury trial by promising not to sentence him to death. In support of this claim, Pirela argues that he was particularly susceptible to the trial judge's promise because he is severely mentally impaired, illiterate and a non-English speaker. To clarify, Pirela raises these arguments as a single claim.

It is the majority that divides Pirela's claim in two. It considers separately: (i) whether the trial judge's promise induced Pirela to waive a jury trial and (ii) whether Pirela's mental impairments rendered him incapable of a knowing and voluntary waiver. But Pirela refers to his mental impairments to support the claim that his jury trial waiver was induced. I believe the majority's approach does Pirela a disservice. It carves out Pirela's mental impairments as a supposed second claim, and thereby sets these facts aside. This makes it easier for the majority to reject Pirela's claim that his waiver was induced, but it is not how Pirela pled his case.

Pirela requests an evidentiary hearing on his habeas corpus petition and argues that the trial court improperly denied a hearing on his first PCRA. The District Court denied Pirela's request for an evidentiary hearing, and denied relief. This Court granted a

---

tested Pirela in Spanish, "placed Pirela's IQ at 57" and his academic ability "in the kindergarten to first grade level." App. 4611-12. Lay witnesses further testified that Pirela was born with the umbilical cord wrapped around his neck; suffered numerous serious falls as a child; was in special education classes; and could never understand simple instructions.

[5] Pirela originally filed his habeas corpus petition in 1990; it was placed in suspense in 1992 while Pirela exhausted his state court remedies.

certificate of appealability because "[j]urists of reason would debate the correctness of the District Court's conclusion." App. 93.

## II

Pre-AEDPA habeas corpus review involves, in relevant part, two related but distinct questions. First, we ask whether a habeas petitioner is entitled to an evidentiary hearing in federal court. Second, we ask whether the federal court is bound by state court fact-findings under 28 U.S.C. § 2254(d) (1966). As a leading treatise explains, a court should approach these questions "sequential[ly]." 1-20 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 20.2(d) (7th ed. 2016). Specifically, we should determine first, whether a defendant is entitled to an evidentiary hearing. Only then should we "reach[] the latter issue," whether a presumption of correctness applies under Section 2254(d), having considered "all the relevant evidence, including evidence that may have been adduced at a federal hearing." *Id.*

In Pirela's case, the District Court denied habeas corpus relief without an evidentiary hearing. Therefore, I approach this case by asking whether an evidentiary hearing is warranted in federal court. I follow this Court's standard, pre-AEDPA analysis, set forth in *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 291 (3d Cir. 1991). "First, we must determine whether the petitioner has alleged facts that, if proved, would entitle

him to relief. If so, we must then decide whether an evidentiary hearing is necessary to establish the truth of those allegations." *Id.* (citations omitted).[6]

The majority takes a different approach to Pirela's case. It focuses on whether the state court findings of fact are entitled to a presumption of correctness under 28 U.S.C. § 2254(d) (1966). I believe it is premature to make this determination. Pirela should first be given an opportunity to rebut the state court fact-findings at an evidentiary hearing. *See* 28 U.S.C. § 2254(d) (1966) (allocating to the petitioner the burden of rebutting state court factual determinations).[7]

## III

In the first step of the *Zettlemoyer* analysis, I ask whether Pirela has alleged facts that, if proven, would entitle him to relief for the violation of his constitutional right to a jury trial. I believe he has.

## A

---

[6] Because the District Court denied relief without an evidentiary hearing, the standard of review is plenary. *Richardson v. Pa. Bd. of Prob. & Parole*, 423 F.3d 282, 287 n.3 (3d Cir. 2005).

[7] Even if I were to begin with Section 2254(d), I would hold that the state court findings of fact are not entitled to a presumption of correctness. There are eight enumerated exceptions to the presumption of correctness. 28 U.S.C. §§ 2254(d)(1-8) (1966); *see also Jefferson v. Upton*, 560 U.S. 284, 293 (2010) (per curiam). For the reasons below, I believe that the state court findings of fact are not entitled to a presumption of correctness under three subsections: where "the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing"; where "the applicant did not receive a full, fair, and adequate hearing in the State court proceeding"; and where the "factual determination is not fairly supported by the record." 28 U.S.C. §§ 2254(d)(2), (6), (8) (1966).

The Sixth and Fourteenth Amendments of the United States Constitution guarantee the right to a jury trial. *Duncan v. Louisiana*, 391 U.S. 145 (1968). This "guarantee[] . . . reflect[s] a profound judgment about the way in which law should be enforced and justice administered." *Id.* at 155. "If the defendant prefer[s] the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he [is] to have it." *Id.* at 156. "The deprivation of that right, with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as 'structural error,'" not subject to harmless error analysis. *Sullivan v. Louisiana*, 508 U.S. 275, 281-82 (1993).

Although a defendant may waive the right to a jury trial, such a waiver is only valid if made knowingly, intentionally and voluntarily. *Adams v. United States ex rel. McCann*, 317 U.S. 269, 277-78 (1942); *see also Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) ("A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege."). A waiver is invalid if "induced by threat[,] . . . misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper." *Brady v. United States*, 397 U.S. 742, 755 (1970) (citation omitted). "[C]ases of disappointed but unfounded expectations must be carefully distinguished from those in which the defendant's expectations as to his sentence are predicated upon promises by the Government or statements from the court." *United States v. Crusco*, 536 F.2d 21, 24 (3d Cir. 1976) (citation omitted). "Where the record shows that 'circumstances as they existed at the time of the [jury trial waiver], judged by objective standards, reasonably justified his mistaken impression,' a defendant must be held to

have entered his [waiver] without full knowledge of the consequences and involuntarily." *Id.* (citation omitted).

A petitioner who claims that his jury trial waiver was invalid "faces a heavy burden" on habeas review. *Zilich v. Reid*, 36 F.3d 317, 320 (3d Cir. 1994). This is because there will ordinarily be an on-the-record waiver colloquy, which is a "formidable barrier" to relief. *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). But this barrier is not "insurmountable." *Id.* We have repeatedly held that a waiver may be involuntary, even where there was a colloquy. *See, e.g.*, *Dickerson v. Vaughn*, 90 F.3d 87, 91-92 (3d Cir. 1996) (granting writ of habeas corpus); *Zilich*, 36 F.3d at 323 (remanding for evidentiary hearing); *Heiser v. Ryan*, 951 F.2d 559, 562 (3d Cir. 1991) (same); *Lesko v. Lehman*, 925 F.2d 1527, 1540 (3d Cir. 1991) (same); *United States v. Marzgliano*, 588 F.2d 395, 398-400 (3d Cir. 1978) (same).

**B**

Pirela alleges facts that, if proven, would entitled him to relief. There are two factual predicates for Pirela's claim that his jury trial waiver was invalid: (1) that the trial judge promised Pirela that if he waived his right to a jury trial, she would not sentence him to death and (2) that the trial judge's promise induced Pirela to waive a jury trial. I address each factual allegation in turn.

**1**

First, Pirela alleges that the trial judge promised that if he waived his right to a jury trial, she would not sentence him to death. This is an unusual case. Pirela does not contend that the trial judge made an off-the-record and unverifiable promise. To the

contrary, the trial judge unquestionably said of Pirela, on the record, in open court: "*He's not subject to the death penalty as long as he has me for a Judge.*" App. 220 (emphasis added). This is "sufficient objective proof on the record in statements by the . . . [trial] judge to support [Pirela']s claim that he misunderstood the maximum sentence he faced." *Crusco*, 536 F.2d at 24-25.

The majority claims that "there is no record evidence supporting Pirela's interpretation" that the trial judge made a promise predicated upon a waiver of his right to a jury trial. I disagree. The "record evidence" is the trial judge's own words.

Despite the plain meaning of the trial judge's statement, the Pennsylvania Supreme Court found that her statement "appears not to constitute a 'guarantee' that [Pirela] would not be sentenced to death." *Commonwealth v. Pirela (Pirela I)*, 507 A.2d 23, 28 (Pa. 1986). That is, it found that what the trial judge said is not what she meant. The trial judge *said*, "He's not subject to the death penalty as long as he has me for a Judge." App. 220. According to the state court, what she *meant* was that she would not impose the death penalty "if the evidence proved the facts to be as represented by defense counsel during his motion." *Pirela I*, 507 A.2d at 28.

The state court derived its alternative interpretation from the "context." *Id.* at 53. However, its description of the context is inaccurate. Specifically, the context for the trial judge's statement was an argument by defense counsel—that if the facts were as he proffered, a death sentence would be legally unavailable. The state court's description of the context is different—that if the facts were as he proffered, the death penalty would be

legally available, but the trial judge would choose not to impose it.[8]  Thus, I would hold that Pirela has adequately alleged the first factual predicate for his claim that his jury trial waiver was invalid.

## 2

The second factual predicate for Pirela's claim is that the trial judge's promise induced him to waive a jury trial.  Pirela supports this factual allegation primarily with two affidavits.  Pirela himself avers that he decided to waive his right to a jury trial "because I believed that if I did so, [the trial judge] would not sentence me to death; I believed this because both the interpreter and my attorney, [defense counsel], told me that [the trial judge] had made this promise in court."  App. 222-23.  Defense counsel avers that "[a]t the time [the trial judge] made the promise . . . that she would not sentence Mr. Pirela to death, Mr. Pirela and I had not yet reached a final decision that he would waive his right to a jury for the guilt/innocence" phase.  App. 229.  Defense counsel further avers that he "recommended that based on [the trial judge]'s promise, [Pirela] should waive his right to a jury trial and rely on the judge's promise."  *Id.*

These affidavits, of course, have not been subjected to the crucible of cross-examination.  Below I discuss some of the obstacles Pirela would face at an evidentiary hearing.  However, the question at this stage of the *Zettlemoyer* analysis is "whether the petitioner has alleged facts that, if proved, would entitle him to relief."  *Zettlemoyer*, 923 F.2d at 291.  He has.  Assuming that the trial judge's promise induced Pirela to waive his

---

[8]  I note that Pirela is a mentally impaired, illiterate, non-English speaker, upon whom the context was almost certainly lost.

constitutional right to a jury, the waiver "would not be voluntary, and . . . may be collaterally attacked." *Lesko*, 925 F.2d at 1538 (citations omitted).

## IV

The next question in the *Zettlemoyer* analysis is "whether an evidentiary hearing is necessary to establish the truth of [Pirela's] allegations." *Zettlemoyer*, 923 F.2d at 291.[9] I would hold that an evidentiary hearing is necessary. Specifically, I believe an evidentiary hearing is necessary to determine whether the trial judge's promise induced Pirela to waive a jury trial.[10]

## A

Whether Pirela is entitled to an evidentiary hearing in federal court is based upon the pre-AEDPA standard of *Townsend v. Sain*, 372 U.S. 293 (1963). Under *Townsend*, "the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive *a full and fair evidentiary hearing* in a state court, either at the time of the trial or in a collateral proceeding" on a factual dispute material to his claim. *Id.* at 312 (emphasis added). "In other words a federal evidentiary hearing is *required*

---

[9] Before obtaining an evidentiary hearing, a habeas corpus petitioner must overcome summary dismissal. *Blackledge*, 431 U.S. at 76. A petitioner must provide more than "conclusory allegations unsupported by specifics" or "contentions that in the face of the record are wholly incredible." *Id.* at 74. Pirela has alleged far more. His allegations are detailed and specific; they are supported by the record of the pre-trial hearing and by affidavits. Thus, summary dismissal is not warranted. *See, e.g.*, *Lesko*, 925 F.2d at 1538.

[10] An evidentiary hearing is not necessary as to the other factual predicate for Pirela's claim—that the trial judge promised not to sentence him to death if he waived a jury trial. I believe this fact is established by the trial judge's own statement, "He's not subject to the death penalty as long as he has me for a Judge." App. 220.

unless the state-court trier of fact has after a full hearing reliably found the relevant

facts." *Id.* at 312-13 (emphasis added).[11]

  *Townsend* specified six situations where a hearing is mandatory. These are where:

> (1) the merits of the factual dispute were not resolved in the state hearing;
> (2) *the state factual determination is not fairly supported by the record as a whole;*
> (3) *the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing*;
> (4) there is a substantial allegation of newly discovered evidence;
> (5) *the material facts were not adequately developed at the state-court hearing*; or
> (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Id.* at 313 (emphasis added).

**B**

  The majority concludes that none of the *Townsend* scenarios apply to Pirela. In

contrast, I would hold that the state court fact-finding was inadequate for three reasons:

"the state factual determination is not fairly supported by the record as a whole," "the

---

  [11] An evidentiary hearing is not required where the failure to present evidence in state court was petitioner's own failure, unless, *inter alia*, the failure is excusable for cause and prejudice, or because "a fundamental miscarriage of justice would result." *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 11-12 (1992). *Tamayo-Reyes* is inapplicable to Pirela because the failure to present evidence was not "the fault of the petitioner." *Cristin v. Brennan*, 281 F.3d 404, 415 (3d Cir. 2002).

fact-finding procedure employed by the state court was not adequate" and "the material facts were not adequately developed at the state-court hearing." *Id.*[12]

**1**

First, I would hold that the state court's factual determination was not fairly supported by the record. The Pennsylvania Supreme Court found that Pirela decided to waive a guilt-phase jury trial "prior to" the trial judge's promise and, therefore, was not induced by it. *Pirela I*, 507 A.2d at 28; *Pirela II*, 726 A.2d at 1031 n.9. As a starting point, this fact-finding is contradicted by affidavits, from Pirela and defense counsel. These affidavits state that the trial judge's promise did induce Pirela to waive a jury trial.

Furthermore, the evidence the majority examines to evaluate the state court's fact-finding does not undercut Pirela's assertion that the trial judge's promise induced him to waive a jury trial. This evidence is primarily (i) a statement by Pirela's defense counsel; (ii) the timing of the trial judge's promise; and (iii) Pirela's guilt-phase waiver colloquy. I address each in turn.

First, like the state court, the majority examines a statement by defense counsel at the pre-trial hearing. Defense counsel agreed—*before* the trial judge made her promise— that the case was "going to be a waiver." App. 220. From this statement, the majority infers that "the parties fully understood that Pirela would waive the jury right." The problem with this inference is that these were counsel's words, not Pirela's. From

---

[12] Unlike the majority, I would hold that the latter two *Townsend* scenarios were adequately raised in Pirela's habeas corpus petition, which asserts that the state courts improperly denied him an evidentiary hearing on his first PCRA.

defense counsel's words, one can only make assumptions about Pirela's own mindset. These assumptions cut both ways. On one hand, defense counsel might have been speaking for Pirela, who had already decided to waive a jury trial. On the other hand, defense counsel might have been stating his own preference for a non-jury trial.[13] Either way, defense counsel's words are not dispositive because it was Pirela's choice whether to waive a jury trial, and he did not speak. *Taylor v. Illinois*, 484 U.S. 400, 418 n.24 (1988); *see also Boykin v. Alabama*, 395 U.S. 238, 243 (1969); *cf. United States v. Brown*, 849 F.3d 87, 91 (3d Cir. 2017) (holding that the defendant and "not just his counsel" must knowingly waive an objection to dual juries).

Second, the majority considers the timing of the trial judge's promise. When the trial judge made her promise, trial was imminent.[14] Yet again, the timing could support two, conflicting assumptions. The majority assumes that Pirela must have "made up his mind" to waive a jury trial because the trial was scheduled to start so soon. Alternatively, one could reasonably assume that some defendants wait until the last possible moment to commit to waiving the jury trial right. *See Duncan*, 391 U.S. at 158 (observing that "a great many defendants prefer the judgment of a jury to that of a court"). Indeed, the trial judge's promise might have had an especially great impact on Pirela because it came at the eleventh hour—precisely the time when Pirela would have been forced to make a final decision about whether to waive a jury trial or not.

---

[13] Defense counsel might have preferred a non-jury trial, either for his own expedience or because he believed it was in Pirela's best interest.

[14] I assume that no one contemplated a continuance.

Third, the majority examines Pirela's guilt-phase waiver colloquy. Again, this is not dispositive. During this colloquy, Pirela never said that he decided to waive a jury trial irrespective of trial judge's promise. There was no mention of her promise at all. Moreover, Pirela offers a plausible explanation for why he agreed generally that there had been no promises—he did not believe the trial judge was asking about herself. This explanation is reasonable. The trial judge asked Pirela, "Has anyone promised you anything to get you to waive a trial by jury?" App. 238. The form of this question implies that the person asking (the trial judge) is not referring to herself. Moreover, the trial judge holds a position of authority; this implies that her role is to ferret out others' impropriety, not her own. *Marzgliano*, 588 F.2d at 399 (observing that "most defendants could be expected to deny 'any impropriety,'" especially involving the trial judge) (citation omitted). On top of this, Pirela would have had particular difficulty understanding the trial judge's question because he is both mentally-impaired and a non-English speaker. *Cf. United States v. Shorty*, 741 F.3d 961, 969 (9th Cir. 2013) (holding that a defendant's "low I.Q. and learning disability undoubtedly made it more difficult for him . . . to follow courtroom discussions").

Thus, for all of these reasons, I believe that "the state factual determination is not fairly supported by the record as a whole." *Townsend*, 372 U.S. at 313. I would remand to the District Court for an evidentiary hearing.

**2**

In the alternative, I would hold that Pirela is entitled to an evidentiary hearing because the "the fact-finding procedure employed by the state court was not adequate to

afford a full and fair hearing." *Id.* State court proceedings may be inadequate where, *inter alia*, "[a] state appellate court purported to make findings of fact . . . by implicitly . . . making demeanor or credibility judgments of a type not within the competence of appellate judges." Hertz & Liebman, *supra*, § 20.3(d)(4). "Where an unresolved factual dispute exists, demeanor evidence is a significant factor in adjudging credibility. And questions of credibility, of course, are basic to resolution of conflicts in testimony." *Townsend*, 372 U.S. at 322. Where the merits of a habeas petitioner's claim "require credibility determinations that cannot be resolved by review of the cold record, the district court must give him an evidentiary hearing." *Zilich*, 36 F.3d at 323 (citation omitted) (remanding for an evidentiary hearing on claim that the petitioner's guilty plea was induced by defense counsel's promise to bribe the trial judge).

In Pirela's case, the Pennsylvania Supreme Court found on direct appeal that Pirela decided to waive a jury trial "prior to" the trial judge's promise. *Pirela I*, 507 A.2d at 28. The Pennsylvania Supreme Court repeated this finding on post-conviction review. *Pirela II*, 726 A.2d at 1031 n.9. Appellate review was inadequate to make such a finding of fact. To the contrary, whether Pirela decided to waive a jury trial "prior to" the trial judge's promise requires a credibility determination. Pirela avers that he decided to waive his right to a jury trial because he "believed that if I did so, [the trial judge] would not sentence me to death; I believed this because both the interpreter and my attorney, [defense counsel], told me that [the trial judge] had made this promise in court." App. 222-23. Defense counsel concurs. I would remand so that the District Court can determine whether these statements are credible.

There is yet a third independent reason under *Townsend* for granting an evidentiary hearing: "the material facts were not adequately developed at the state-court hearing." *Townsend*, 372 U.S. at 313. *Heiser v. Ryan* illustrates this *Townsend* scenario. 951 F.2d at 562. In *Heiser*, a petitioner alleged that his guilty plea was coerced by defense counsel's threat that if the petitioner did not plead guilty, counsel would withdraw from the case. *Id.* at 561. The petitioner's claim was undercut by his statement at a guilty plea colloquy that his plea was *not* the product of force or threats. *Id.* at 562. Nevertheless, this Court held that the colloquy could not take the place of an evidentiary hearing on the petitioner's allegation because the colloquy consisted of "yes-and-no answers to broad and general questions." *Id.* An evidentiary hearing was necessary under *Townsend* because, *inter alia*, "the material facts were not adequately developed at the state-court [plea] hearing." *Id.* at 562 (quoting *Townsend*, 372 U.S. at 313).

In Pirela's case, as in *Heiser*, the material facts were not adequately developed in a state court hearing. Specifically, the state court did not determine, *inter alia*, any of the following facts: (i) whether defense counsel spoke for Pirela when he stated, before the trial judge's promise, that the case was "going to be a waiver," App. 220; (ii) whether Pirela had "made up his mind," to waive a jury trial before the trial judge's promise because his trial date was imminent; or (iii) whether Pirela understood during his guilt-phase waiver colloquy that the trial judge was asking about her own promise, when she asked Pirela if any promises had been made to him. The state court did not develop any

of these facts.  For this reason also, I would remand to the District Court for an

evidentiary hearing.

I respectfully dissent.